Fred FISHER, Plaintiff-Appellant,

v.

The FIRST NATIONAL BANK OF CHICAGO, Defendant-Appellee.

No. 75–1670.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1976.

Decided July 29, 1976.

Rehearing and Rehearing En Banc
Denied Aug. 31, 1976.

James E. Beckley, Chicago, Ill., Everett Meeker, Washington, Iowa, for plaintiff-appellant.

Joseph DuCoeur and Alan I. Becker, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, and CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The principal issue in this appeal is whether the interest rate charged by a national banking association with its principal place of business in Chicago in connection with the use of its bank credit cards by customers in Iowa, is governed by the 18% rate fixed by the Illinois Revolving Credit Act, by the 18% rate fixed for Iowa Small Loan Companies, by the 12% rate fixed for Iowa state banks or by the 9% rate fixed for persons generally in Iowa.

I

The plaintiff, Fred Fisher, brought this action in the district court for the Southern District of Iowa as a class action on behalf of himself as well as on behalf of all other persons within the State of Iowa who were customers of the defendant's, The First National Bank of Chicago, FirstCard and Bank-

Americard credit card plans who had unpaid balances in their credit accounts within two years of the filing of his complaint on September 3, 1971, alleging that the defendant charged usurious interest. The complaint was based on two sections of the National Bank Act, 12 U.S.C. § 85, establishing rates of interest, and § 86, fixing penalties for usurious interest.

The defendant bank moved to dismiss the action on February 18, 1972, on the ground that the jurisdiction over national banks is derived from 28 U.S.C. § 1348 [1] and that under that section federal courts lack jurisdiction unless diversity or a federal question, as well as the jurisdictional amount, is pleaded under 28 U.S.C. § 1332 or § 1331.[2]

On May 9, 1972, the district court in Iowa sustained defendant's motion and dismissed the case on the basis of lack of subject matter jurisdiction. The Eighth Circuit Court of Appeals sitting *en banc* heard the *Fisher* case and another similar case, and concluded on April 20, 1973, that 28 U.S.C. § 1337,[3] the commerce jurisdiction provision, which does not require a minimum jurisdictional amount or diversity, applies to and gives federal courts jurisdiction over all suits brought under specific provisions of the National Bank Act. The court said that "[i]t seems almost elementary that Congress regulates national banks primarily under the commerce clause, and that the National Bank Act, including 12 U.S.C. §§ 85 and 86, is an Act regulating commerce for purposes of § 1337." *Burns v. American National Bank and Trust Co.,* 479 F.2d 26, 29 (8th Cir. 1973).

We consider the question of proper jurisdiction under § 1337 settled by the Eighth Circuit's opinion in *Burns v. American National Bank and Trust Co., supra,* as part of

the law of this case. 1B J. Moore, Federal Practice ¶ 0.404[8] at 531–537 (2d ed. 1974). In any event, the Eighth Circuit opinion appears to express the prevailing view. *Cupo v. Community National Bank & Trust Co.,* 438 F.2d 108 (2d Cir. 1971); *Brown v. First National City Bank,* 503 F.2d 114 (2d Cir. 1974); *Partain v. First National Bank of Montgomery,* 467 F.2d 167 (5th Cir. 1972); *Cosgrove v. First & Merchants National Bank,* 68 F.R.D. 555 (E.D.Va.1975); *cf. State of Iowa v. First of Omaha Service Corp.,* 401 F.Supp. 439 (S.D.Iowa 1975).

The Eighth Circuit pointed out that plaintiff Fisher had originally failed to allege jurisdiction under 28 U.S.C. § 1337, but after the trial court had sustained defendant's motion to dismiss, the plaintiff moved to amend his complaint, charging that the defendant violated plaintiff's civil rights and violated the antitrust laws by charging usurious interest. In the antitrust count, the plaintiff expressly alleged that jurisdiction was based on § 1337. The Eighth Circuit directed the Iowa district court upon remand to permit the filing of the amendment to the complaint. 479 F.2d at 30.

## II

Upon remand the Iowa district court allowed the amendment to be filed. There remained pending in the district court, however, the defendant's motion to dismiss for improper venue which it had filed on November 4, 1971, shortly after the original complaint had been filed. The defendant's motion was phrased in the alternative, to dismiss or transfer the cause.

On February 14, 1974, the district court for the Southern District of Iowa transferred the cause of action in its entirety to the

---

1. The last sentence of § 1348 reads: "All national banking associations shall, for the purposes of all . . . actions by or against them, be deemed citizens of the States in which they are respectively located."

2. § 1332 requires diversity of citizenship and an amount in controversy in excess of $10,000; § 1331 requires a federal question and an amount in controversy in excess of $10,000;

plaintiff's complaint alleged that the total amount of interest purported to be charged at usurious rates was $97.30.

3. § 1337 provides: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

Northern District of Illinois in accordance with 28 U.S.C. § 1406(a).[4]

■ The venue provision of the National Bank Act provides that suits against national banking associations may be brought only in the federal court "within the district in which such association may be established" or in the state court "in the county or city in which said association is located," 12 U.S.C. § 94.[5] The jurisdictional statute relating to national banking associations also uses both the terms "established" and "located." 28 U.S.C. § 1348. In *Cope v. Anderson,* 331 U.S. 461, 467, 67 S.Ct. 1340, 1343, 91 L.Ed. 1602 (1947), the Supreme Court in effect held that these terms are synonymous, saying:

> For jurisdictional purposes, a national bank is a "citizen" of the state in which it is established or located, 28 U.S.C. § 41(16) [the predecessor of 28 U.S.C. § 1348], and in that district alone can it be sued. 12 U.S.C. § 94.

The Supreme Court construed the venue provision as recently as in *Radzanower v. Touche Ross & Co.,* —— U.S. ——, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976), where it held that venue in a suit against a national banking association charged with violating the Securities Exchange Act of 1934 is governed by § 94 rather than by the broad venue provision of the Securities Exchange Act and hence the suit could be brought only within the district where the association was established. The Court said:

> Federal courts have consistently ruled that the place specified in a bank's charter as its home office is determinative of the district in which the bank is "established" for purposes of § 94. *See, e. g., Buffum v. Chase Nat. Bank,* 192 F.2d 58, 60 (CA 7); *Leonardi v. Chase Nat. Bank,* 81 F.2d 19, 22 (CA 2).[6]

*Id.* at ——, 96 S.Ct. at 1992, at 4762, n.2.

Although the *Radzanower* language specifies only "established," not only does the *Cope* language indicate that "located" means the same thing[7] but federal courts have also consistently ruled that the state in which the association is "located" as used in § 94 is the state in which the association's principal place of business is maintained. *Buffum v. Chase National Bank,* 192 F.2d 58 (7th Cir. 1951), *cert. denied,* 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 702; *American Surety Co. v. Bank of California,* 133 F.2d 160 (9th

---

**4.** As part of this appeal, the plaintiff has requested that the transfer order be vacated and reversed, and that the cause be sent back to Iowa. The same plaintiff brought a Truth in Lending Act complaint in the Southern District of Iowa against a different defendant, a national banking association established and having its principal place of business in Nebraska. The same district judge who transferred the present case to Illinois, transferred the other case to Nebraska. *Fischer v. First National Bank of Omaha,* 338 F.Supp. 525 (S.D.Iowa 1972). The plaintiff appealed the transfer of that case and the transfer of a usury case against the same national bank to Nebraska, but the Eighth Circuit dismissed the appeal *sua sponte* on the ground that transfer orders are interlocutory and nonappealable. *Fischer v. First National Bank of Omaha,* 466 F.2d 511 (8th Cir. 1972), a view accepted by virtually all jurisdictions. 9 J. Moore, Federal Practice ¶ 110.13[6] at 173 (2d ed. 1975). Therefore, we consider that the February 14, 1974 transfer order is properly part of this appeal.

**5.** Section 94 in its entirety reads:
Actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county or municipal court in the county or city in which said association is located having jurisdiction in similar cases.

**6.** The *Buffum* language was:
A national bank is established within the meaning of this act only in the place where its principal office and place of business is as specified in its organization certificate. 192 F.2d at 60.
The *Leonardi* language was:
. . . [T]he district in which the national bank has its principal place of business and which contains the place recited in its charter . . . should be taken as the proper district for suits against a national bank. 81 F.2d at 22.

**7.** In *Mercantile National Bank v. Langdeau,* 371 U.S. 555, 561, 83 S.Ct. 520, 523, 9 L.Ed.2d 523 (1963), the Court said: "All of the cases in this Court which have touched upon the issue here are in accord with our conclusion that national banks may be sued only in those state courts in the county where the banks are located."

Cir. 1943); *United States National Bank v. Hill*, 434 F.2d 1019, 1020 (9th Cir. 1970).

The First National Bank of Chicago is a national banking association. A national banking association is created by the making of an organization certificate, 12 U.S.C. § 22, which is filed with and recorded by the Comptroller of the Currency, § 23, who issues a certificate authorizing the association to commence the business of banking, § 27.

The organization certificate must "specifically state . . . [t]he place where [the association's] operations of discount and deposit are to be carried on, designating the State, Territory, or District, and the particular county and city, town, or village," 12 U.S.C. § 22. Any national banking association "with the approval of the Comptroller of the Currency, may . . . change the location of the main office . . . within the limits of the city, town, or village in which it is situated" or with the Comptroller's approval and by a vote of shareholders owning two-thirds of the stock "may change the location of the main office . . . to any other location outside the limits of the city, town, or village in which it is located, but not more than thirty miles distant . . ." 12 U.S.C. § 30.

The First National Bank's location as specified in its charter or organization certificate is Chicago, Illinois, and the principal office of the association is located at One First National Plaza, Chicago, Illinois. These facts are established by the complaint which alleges that the bank "has its principal banking house at Chicago, Illinois" and by the uncontradicted affidavit of the bank's cashier. Furthermore the district court for the Southern District of Iowa ordered "this cause of action transferred [on the basis of the national banking association venue provision] in its entirety to the Northern District of Illinois where the defendant . . . is established."

The plaintiff's attack on the transfer order was based in the district court in Iowa upon the claim of repugnancy between the limited venue provision of § 94 of the National Bank Act, 12 U.S.C. § 94, and the broad venue provision of § 12 of the Clayton Act, 15 U.S.C. § 22. Exactly the same argument was rejected by the Supreme Court in *Radzanower v. Touche Ross & Co.*, —— U.S. ——, 96 S.Ct. 1989, 48 L.Ed.2d 540, 44 U.S.L.W. 4762 (1976), in the context of the broad venue provision of § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa. The transfer of the case to the Northern District of Illinois was therefore proper and mandatory. We proceed to the merits.

III

The record in the transferred case arrived in the Northern District of Illinois on February 21, 1974. On May 2, 1974, the defendant bank filed a motion to dismiss for failure to state a claim upon which relief could be granted. On May 29, 1975, the district court in Chicago granted the motion and dismissed the entire action upon concluding that the defendant did not charge usurious interest. The court further found that "[i]nsofar as the alleged charging of usurious interest is the cornerstone of each of the remaining three counts of plaintiff's second amended complaint, the court finds that, in light of the above holding, the three remaining counts [civil rights and antitrust] of the complaint must also be dismissed."[8]

On June 13, 1975, the district court followed its dismissal order with a memorandum opinion which found and held that the interest rates which defendant may legally charge on loans are governed by 12 U.S.C. § 85; that defendant charged the plaintiff 18% per annum; that Illinois permits the charging of 18% per annum on the unpaid balance of debt incurred through a bank credit card; that Iowa allows the charging of 18% per annum on loans under $1,000;

---

8. The Iowa district court in its transfer order of February 14, 1974 voiced a similar conclusion when it said that "the usury or fundamental count must be tried in the Northern District of Illinois and public policy would be strengthened by ordering this case to be tried there in its entirety."

that plaintiff never borrowed more than $1,000 from the defendant at any one time; that defendant conducts its credit card business in Iowa with the help of Iowa correspondent state banks; and that state banks in Iowa are limited to charging 12% per annum. The district court stated in its memorandum opinion:

Although Section 85 is silent as to the permissible rate of interest on loans made to borrowers situated in states other than where the national bank is located, this Court feels that under such situations the permissible rate would be defined by the laws of the state in which the borrower is situated. However, a national bank making such a loan would retain its "most favored lender" status within the parameters of that state's laws.

[A ruling of the Comptroller of the Currency][9] indicates that defendant is allowed to avail itself of the provisions of the Iowa Small Loans Act even if it does not comply with any of the provisions of that act other than the provisions relating to the interest rate.

Accordingly, it is the finding of this Court that the National Banking Act grants to the defendant a "most favored lender" status when it extends credit to borrowers in Iowa. Therefore, defendant could avail itself of the provisions of the Iowa Small Loans Act even though Iowa state banks could not. The logical extension of this finding is that defendant did not charge a usurious rate of interest on the loans it made to plaintiff.

We agree with the district court's conclusion dismissing the case for failure of the defendant bank to charge usurious interest, but not for entirely the same reasons.

## IV

The facts of this case require us to interpret the following language of the statute determining the rate of interest chargeable by national banking associations, 12 U.S.C. § 85:[10]

---

**9.** The ruling of the Comptroller of the Currency provides that:

"(a) A national bank may charge interest at the maximum rate permitted by State law to any competing State chartered or licensed lending institution. If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject to the provisions of State law relating to such class loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company or morris plan bank, without being so licensed."

12 C.F.R. § 7.7310.

**10.** Section 85 in its entirety reads:

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, or in the case of business or agricultural loans in the amount of $25,000 or more, at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, or in the case of business or agricultural loans in the amount of $25,000 or more, at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance reckoning the days for which the note, bill, or other evidence of debt has to run. The maximum amount of interest or discount to be charged at a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the country, territory, dependency, province, dominion, insular possession, or other political subdivision where the branch is located. And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, dis-

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District *where the bank is located,* . . . and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for *associations organized or existing in any such State* under this chapter. (Emphasis added.)

Our task is twofold: first, what rate of interest is authorized by the state "where the bank is located" and what state is that; and second, what effect does the exception have upon "associations organized or existing in any such State" and what state is that?

From our prior discussion in Part II of 12 U.S.C. § 94, the national banking association venue provision, and the *Radzanower* case, there can certainly be no lingering doubt as to the meaning of "where the bank is located." None of the cases indicate that Congress gave one meaning to "locate" in § 94 and another meaning to the same word in § 85. The defendant here is located, established and organized in only Chicago, Illinois, and is subject therefore to the rate of interest "allowed by the laws of the State" of Illinois. If we could stop there and only look at the first portion of § 85, we could easily conclude that the 18% per annum rate of interest allowed by the Illinois Revolving Credit Act, Ill.Rev.Stat., ch. 74, § 4.2 (1973), governs the rate chargeable by the defendant within Illinois and anywhere else that it might do business. The language is certainly broad enough to bear that interpretation. It refers to the interest on "any loan or discount made" as being governed by the laws of the single state where the national bank can be located.

The applicability of the Illinois 18% Act to the defendant within Illinois has not been questioned in these proceedings. The crux of this case is what law governs when

the Chicago-located national banking association does business in another state, here Iowa. What causes difficulty is the language of the "except" phrase which follows.

In 1873, when the Supreme Court decided *Tiffany v. National Bank of Missouri,* 85 U.S. 409, 21 L.Ed. 862, the exception read as it does today except that it applied to "associations organized in any such State" instead of to "associations organized or existing in any such State" as it now reads. In that case, the laws of Missouri allowed 10% interest to be charged by all persons except state banks, which were only allowed to charge 8%. A national banking association organized in Missouri charged 9% which was alleged to be usurious. In holding that the national bank could lawfully charge 10%, the Supreme Court said:

> There can be no question that if the banks of issue of Missouri were allowed to demand interest at a higher rate than 10 per cent. National banks might do likewise. And this would be for the reason that they would then come within the exception made by the statute, that is, the exception from the operation of the restrictive words "no more" than the general rate of interest allowed by law. But if it was intended they should in no case charge a higher rate of interest than State banks of issue, even though the general rule was greater, if the intention was to restrict rather than to enable, the obvious mode of expressing such an intention was to add the words "and no more," as they were added to the preceding clause of the section. The absence of those words, or words equivalent, is significant. Coupled with the general spirit of the act, and of all the legislation respecting National banks, it is controlling. . . . Obviously, if State statutes should allow to their banks of issue a rate of interest greater than the ordinary rate allowed to natural persons, National banking associations could not compete with them, unless allowed the same. On the other hand, if such associations were

count, or sale, at not more than the current rate of exchange for sight drafts in addition

to the interest, shall not be considered as taking or receiving a greater rate of interest.

restricted to the rates allowed by the statutes of the State to banks which might be authorized by the State laws, unfriendly legislation might make their existence in the State impossible. A rate of interest might be prescribed so low that banking could not be carried on, except at a certain loss. The only mode of guarding against such contingencies was that which, we think, Congress adopted. It was to allow to National associations the rate allowed by the State to natural persons generally, and a higher rate, if State banks of issue were authorized to charge a higher rate. This construction accords with the purpose of Congress, and carries it out. It accords with the spirit of all the legislation of Congress. National banks have been National favorites.

*Id.* at 412–413, 21 L.Ed. 862.

The Eighth Circuit has recognized that the *Tiffany* case construed § 85 to place national banks in a position of limited advantage over state banks by allowing them to charge interest at the highest rate applicable under state law to lenders generally and not necessarily at the rate applicable to state banks, which might be lower, that is the so-called "most favored lender status." *First National Bank in Mena v. Nowlin,* 509 F.2d 872, 879–880 (8th Cir. 1975); *United Missouri Bank of Kansas v. Danforth,* 394 F.Supp. 774, 779 (W.D.Mo.1975).

Several cases have extended the *Tiffany* "most favored lender status" to include the type of small loan or revolving credit card laws which are involved in this case. In other words, *Tiffany* has not been restricted to interpreting the first words of § 85 as applying to state rates established for "natural persons" and the exception to permit to a national bank a comparable state bank rate which is higher than the highest state rate allowed to natural persons. The courts have interpreted the allowance clause and the exception together to permit national banking associations to charge the highest rate charged by any person or entity in the state under like conditions. *Northway*

*Lanes v. Hackley Union National Bank & Trust Co.,* 464 F.2d 855, 861–864 (6th Cir. 1972); *Acker v. Provident National Bank,* 512 F.2d 729 (3d Cir. 1975); *Haas v. Pittsburgh National Bank,* 526 F.2d 1083, 1087 (3d Cir. 1976); *United Missouri Bank of Kansas City v. Danforth,* 394 F.Supp. 774 (W.D.Mo.1975). Under this authority, the Illinois 18% rate would, of course, apply to the defendant's business in Illinois.

On this same authority, we would probably be justified in affirming the district court's order of dismissal on the basis of the Iowa 18% rate for the reasons the district court gave:

> Although Section 85 is silent as to the permissible rate of interest on loans made to borrowers situated in states other than where the national bank is located, this court feels under such situations the permissible rate would be defined by the laws of the state in which the borrower is situated.

The same view was also taken in *Meadow Brook National Bank v. Recile,* 302 F.Supp. 62, 73–74 (E.D.La.1969), where the court expressed it with some misgivings:

> In effect, 12 U.S.C. § 85 provides that a national bank may charge interest at the rate allowed by the laws of the state where the bank is located. The question is whether this was meant to fix the rate of interest on *all* loans made by the bank or merely those loans made in that state. Admittedly, the above quoted language would seem to include all loans made by the bank and not solely those made in the state where the bank is located.

The court concluded however:

> We hold that 12 U.S.C. § 85 fixes the rate of interest chargeable by a national bank only as to loans made in the state where the bank is located; it does not fix the rate of interest which may be charged by a national bank which is located in one state and makes a loan in another.

*Id.* at 75.

We are not inclined to so twist the plain meaning of the statute. It clearly states

that the interest on "any loan" is governed by the rate allowed by the state "where the bank is located," which in this case is Illinois. After *Tiffany* was decided the exception was amended by Congress to apply it not only to associations "organized in any such State," which would be redundant inasmuch as the first clause applies to the same state, that is, where the bank is located, but to apply the exception also to associations "organized *or existing* in any such State."[11] In this case the defendant bank appears to "exist" in Iowa, although in our view of the case we need not determine whether it does or not.

We would summarize the statute as it applies to this case as follows: Illinois' 18% per annum statute applies to *all* loans made by the defendant Illinois national banking association, whether made in Illinois or elsewhere, but if the defendant is "existing"[12] in Iowa and if Iowa allowed, which it apparently does not, a rate of interest to its own state banks in excess of 18%, the defendant could charge such higher rate to the defendant's customers in Iowa.

For these reasons, we affirm the judgment of dismissal of the district court.

---

**11.** The *Tiffany* language appeared in the National Bank Act of June 3, 1864, 13 Stat. 99 (so quoted by the Supreme Court as late as *Farmers' and Mechanics' Bank v. Dearing*, 91 U.S. 29, 31, 23 L.Ed. 196 (1875). The addition of "or existing" appeared shortly thereafter in the Revised Statutes of 1878 in § 5197 and seems to have been first so quoted in *National Bank v. Johnson*, 104 U.S. 271, 26 L.Ed. 742 (1881).

**12.** *Central National Bank v. Continental Casualty Co.*, 182 F.2d 407, 409 (7th Cir. 1950):
"Existing" has an ordinary meaning of "the fact, or state, of being or living."